# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICTOF DELAWARE

| | | |
|---|---|---|
| JONATAN NATANAEL CANCHE LOPEZ | : | |
| | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | C.A. No. 19-1001-LPS |
| | : | |
| BASTY YAMID CAMEL BAMACA | : | |
| | : | |
| | : | |
| Respondent. | : | |
| | : | |

Gary R. Spritz, GARY R. SPRITZ, ESQ., Wilmington, DE

     Attorney for Petitioner


Susan E. Morrison, Brandon J. Pakkebier, Daniel A. Taylor, FISH & RICHARDSON P.C., Wilmington, DE

     Attorneys for Respondent


**MEMORANDUM OPINION**


April 20, 2020
Wilmington, Delaware

**STARK, U.S. District Judge:**

Jonatan Natanael Canche Lopez ("Petitioner" or "Father") petitions for return of his young daughter ("Child") under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), alleging that in late 2018 Basty Yamid Camel Bamaca ("Respondent" or "Mother") wrongfully removed Child to, and then retained Child in, the United States without his knowledge or consent.  (D.I. 2; *see also Convention on the Civil Aspects of Int'l Child Abduction*, Oct. 25, 1980, T.I.A.S. No. 116670; 22 U.S.C. §§ 9001-11 (implementing Hague Convention))  For the reasons set forth below, the Court will grant Father's petition and order Child's return.

## BACKGROUND

Child is approximately 3 ½ years old.  From the day she was born in October 2016 until late 2018, Child lived with both Mother and Father in the city of Cancún, which is located in the State of Quintana Roo in Mexico.[1]  (D.I. 2 at ¶ 10)  The family lived in a remodeled cinder-block structure on property owned by Petitioner's mother (the "Room"), which Father had paid to remodel.  (D.I. 80 ("Hrg. Tr.") at 47)  The livability and conditions of the Room are a contested issue in this case.  Father contends that the Room is "similar" to other houses in the neighborhood, and that conveniences such as water, electricity, Internet, microwave, bedding, and running water are available.  (*Id.* at 16-17)  Mother counters, however, that the Room is not comparable to the other homes in their neighborhood (*id.* at 48) and that it was unlivable in many ways – for example, lacking running water in the bathroom (*id.* at 66-67) and having a leaking roof that would lead to puddles on the floor, making it difficult for Child to play on the ground

---

[1] Mother is a citizen of Guatemala, while Father is a citizen of Mexico.  The couple met at church services in 2014.  (*See* D.I. 80 at 64)  They were married in March 2016 and remain married.  (*Id.* at 65)

(*id.* at 68).

The parties also dispute the extent to which Father participated in the couple's parental obligations, but Mother acknowledges that Father at least occasionally (i) paid for prenatal healthcare costs and attended a doctor's visit with Mother (Hrg. Tr. at 71), (ii) went to the park with Child (*id.* at 78), (iii) went out on Sundays to eat with Mother and Child (*id.* at 78), (iv) prepared meals for Child (*id.* at 79-80, 87), (v) disciplined Child (*id.* at 80), and (vi) took Child to see the doctor (*id.* at 87-88). Father contends that his parenting of Child involved substantially more than what Mother acknowledges, including providing consistent affection (*id.* at 18) and protecting and teaching Child (*id.* at 23-27), contentions with which Mother disagrees (*see* D.I. 71 at 7-9).

In late-November 2018, Mother took Child to visit her family in Guatemala. (D.I. 2 at ¶ 11) When Mother left with Child, Father understood the trip to be a family visit and that both would return to Cancún. (Hrg. Tr. at 33) Father supported the trip by purchasing Mother's bus ticket and providing Mother with money. (*Id.*) Once Mother and Child arrived in Guatemala, Father appears to have spoken with Child over the phone every day. (*Id.*) But unbeknownst to Father, Mother planned to leave Guatemala and move with Child to the United States.

At some point in late December 2018 or early January 2019, Mother entered the United States with Child and surrendered to immigration authorities at the Mexico-Texas border. (D.I. 71 at 3) Mother and Child subsequently moved in with family in Georgetown, Delaware. (*Id.*) Father testified that he asked Mother to return to Cancún with Child on January 23, 2019, which Mother declined to do, and that he requested to speak with Child "[a]lmost every day" following her removal to the United States, which Mother also rejected. (Hrg. Tr. at 35-36) While Father consented to Child's visit to Guatemala, he did not consent to Mother's subsequent

2

removal to and retention of Child in Georgetown, Delaware.  (*See id.* at 33-37)

Father, represented by pro bono counsel, filed the instant petition on May 30, 2019, seeking return of Child to Mexico in accordance with the Hague Convention.  (D.I. 2)  The Court appointed counsel for Mother.  (*See* D.I. 25)  On September 11, 2019, Mother filed her answer to Father's petition, raising two affirmative defenses.  (D.I. 32 at ¶¶ 38-39)  Working together cooperatively, the parties narrowed their disputes to issues relating to whether Father was "exercising his custody rights at the time of removal or retention as articulated in Article 13(a) of the Hague Convention and 22 U.S.C. § 9003(e)(2)(B)."[2]  (D.I. 32 at ¶ 39; *see also* D.I. 65)

The Court conducted an evidentiary hearing on December 4, 2019.  (D.I. 80)  As he could not obtain a visa to travel to the U.S., Father testified by telephone from Mexico.[3]  Mother testified in person and brought Child with her.  (*See* Hrg. Tr. at 3)  The Court provided Spanish-language interpreters to both parties.  In addition to live testimony, various exhibits, including photographs and text messages, were admitted into evidence.[4]  (*See* D.I. 78 at 3)  After post-hearing briefing, the Court heard additional argument on January 23, 2020.  (D.I. 88 ("Arg. Tr."))[5]

---

[2] Mother had also argued that Father failed to state a claim for wrongful removal under Article 3 of the Hague Convention.  (D.I. 32 at ¶ 38)  The Court has rejected this contention.  (D.I. 78 at 3-4)

[3] Father undertook reasonable efforts to attend the December 4 evidentiary hearing in person but was denied a visa, despite the lack of a criminal record.  (D.I. 76 at 10; Hrg. Tr. at 31-32)  A representative from the Mexican Consulate in Philadelphia appeared at the hearing as Father's designee.  (Hrg. Tr. at 2-3)

[4] The Court has relied on the Federal Rules of Evidence ("FRE") in this case.  *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 289 (3d Cir. 2006); *see also Demaj v. Sakaj*, 2012 WL 965214, at *3 (D. Conn. Mar. 21, 2012) (relying on FRE in view of "somewhat relaxed" evidentiary standard under Hague Convention and ICARA).

[5] The Court expresses its gratitude to all the attorneys who appeared, all of whom zealously and effectively represented their clients.  The Court also thanks the Clerk's Office staff

**DISCUSSION**

### I.        The Hague Convention And ICARA

The Hague Convention has two main purposes: (1) to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed, and (2) to ensure that rights of custody and access under the law of one Contracting State are effectively respected in other Contracting States. *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (citing Hague Convention at preamble, Art. 1). "It is well settled that the Convention was not designed to resolve international custody disputes," but rather "was designed to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007).

In the United States, the Hague Convention is implemented in the International Child Abduction Remedies Act (ICARA), which provides persons claiming that a child has been wrongfully removed or retained the ability to commence judicial proceedings in a state or federal court having jurisdiction where the child is located. *See* 22 U.S.C. §§ 9001 *et seq.* (formerly 42 U.S.C. §§ 11601 *et seq.*).

To succeed on a petition for return, the petitioner must show, by a preponderance of the evidence, wrongful removal and/or wrongful retention of the child. *See* 22 U.S.C. § 9003(e). The Third Circuit instructs that, under Article 3 of the Hague Convention, a petition presents "four questions that must be answered in a wrongful removal or retention case . . . (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such

---

who facilitated the parties' participation in the proceedings, including by arranging for interpreters and setting up telephone connections to Mexico.

removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." *Tsai-Yi Yang*, 499 F.3d at 270-71.[6]

But the analysis does not stop there. "Even when a court finds wrongful removal or retention, it is not necessarily required to return a child to its habitual residence. After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence." *Karkkainen*, 445 F.3d. at 288; *see also* 22 U.S.C. § 9001(a)(4) ("Children who are wrongfully removed or retained . . . are to be promptly returned unless one of the ***narrow exceptions*** set forth in the Convention applies.") (emphasis added). Article 13(a) of the Hague Convention provides one such narrow exception, where the removing party can seek to prove, by a preponderance of the evidence, that the petitioner was "not actually exercising" custody rights at the time of removal.

When a petitioner satisfies his or her burden to prove wrongful removal or retention under Article 3, and no affirmative defense is proven by a respondent, the Court is obligated to grant a petition and order the child's return. *See German v. Lopez*, 146 F. Supp. 3d 392, 395 (D. Mass. 2015) ("The Hague Convention requires the prompt return of children who have been wrongfully taken from the State in which they habitually reside."); *see also Abbott*, 560 U.S. 1, 5 (2010) ("The Convention's central operating feature is the return remedy.").

---

[6] During the pendency of this case, the Supreme Court issued its decision in *Monasky v. Taglieri*, 140 S.Ct 719 (2020), which addressed questions related to the "habitual residence" prong of the Hague Convention analysis. Neither party has contended that *Monasky* impacts any issue in this case. (*See generally* Arg. Tr. at 28)

## II.      Father Has Met His Burden Under Article 3

Respondent concedes that Petitioner has satisfied his burden to establish a *prima facie* case of wrongful removal and/or retention under Article 3.  That is, Mother agrees that when she removed Child from Child's habitual residence of Mexico to the United States in late 2018, Father's custody rights under the law of Quintana Roo, Mexico were breached.  (*See* D.I. 61; D.I. 69 at 3; D.I. 71 at 5; D.I. 79 at 14; D.I. 86 at 4; D.I. 78 at 2)  Mother further agrees that Father met his burden under Article 3 to show he was exercising his parental rights at the time of the improper removal.  (*See* Arg. Tr. at 7)

Having conceded that Father met his burden under Article 3, Mother presses her affirmative defense under Article 13.

## III.     Mother Has Not Met Her Burden Under Article 13

Given Father's uncontested success in meeting his burden under Article 3, Mother can prevail in this action only by proving, by a preponderance of the evidence, her affirmative defense that Father was not exercising his custodial rights at the time Mother removed Child from Mexico.  (*See* D.I. 32 at ¶ 39; 22 U.S.C. § 9003(e)(2)(B))  Mother insists she can prevail on this defense of non-exercise of rights, under Article 13, even though Father has already shown, for purposes of Article 3, that he was exercising his custodial rights.

Usually, terms are given the same meaning across a statute.  *See Taniguchi v. Kan. Pac. Saipan Ltd.*, 566 U.S. 560, 571 (2012) ("[I]t is a normal rule of statutory construction that identical words in different parts of the same act are intended to have the same meaning."); *see also* 82 C.J.S. Statutes § 411 ("As a matter of statutory construction, a word or phrase repeated in a statute should be given the same meaning throughout.").  Articles 3 and 13(a) both use the phrase ***exercise*** of custody rights.  *Compare* Art. 3 ("at the time of removal or retention those

6

rights **were actually exercised**") (emphasis added) *with* Art. 13(a) ("the person . . . having the care . . . of the child was **not actually exercising** the custody rights at the time of removal or retention") (emphasis added).  That term, "exercise," is not, however, expressly defined in the Hague Convention or ICARA.[7]

To assess what it means to "exercise" custodial rights, the Third Circuit – along with virtually every circuit[8] – follows the abandonment test, which was first articulated in *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-67 (6th Cir. 1996) (*Friedrich II*).  The abandonment test instructs that "nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial right."  *Tsai-Yi Yang*, 499 F.3d at 277.[9]

---

[7] The Hague Convention's official reporter, Elisa Pérez-Vera, has explained that its drafters included the factual element of exercise of custody rights in both Article 3 and Article 13(a) because the "[Hague] Convention, taken as whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it," a presumption which "has to be overcome by discharging the burden of proof which has shifted, as is normal with any presumption, i.e., discharged by the 'abductor' if he wishes to prevent to the return of the child." *See* Elisa Pérez-Vera, Explanatory Report, *in* 3 Hague Convention on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction (1982) ("Pérez-Vera Report"); *see also* Dep't of State, *Hague Convention on the Civil Aspects of Int'l Child Abduction: Legal Analysis*, 51 Fed. Reg. 10,494 (Mar. 26, 1986) ("Hague Convention Analysis") (explaining that Article 13(a) non-exercise "exception derives from Article 3(b)").  The Third Circuit has stated that "Elisa Pérez-Vera was the official Hague Conference Reporter, and her report is generally recognized as 'the official history and commentary on the Convention.'"  *Whiting v. Krassner*, 391 F.3d 540, 546 n.3 (3d. Cir. 2004).

[8] *See, e.g.*, *Tsai-Yi Yang*, 499 F.3d at 277; *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007); *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004); *Walker v. Walker*, 701 F.3d 1110, 1121-22 (7th Cir. 2012); *Avesta v. Petroutas*, 580 F.3d 1000, 1018 (9th Cir. 2009); *Navani v. Shahani*, 496 F.3d 1121, 1130 (10th Cir. 2007); *Seaman v. Peterson*, 762 F. Supp. 2d 1363, 1379-80 (M.D. Ga. 2011), *aff'd* 766 F.3d 1252, 1259 (11th Cir. 2014); *see also Krefter v. Wills*, 623 F. Supp. 2d 125, 133-35 (D. Mass. 2009); *Eidem v. Eidem*, 382 F. Supp. 3d 285, 291-92 (S.D.N.Y. 2019); *Kofler v. Kofler*, 2007 WL 2081712, at *2-3 (W.D. Ark. July 18, 2007).

[9] *Friedrich II* cited three reasons for its broad definition of "exercise:" (1) U.S. courts are not well suited to determine the consequences of parental behavior under the law of a foreign country, (2) an U.S. decision about the adequacy of one parent's exercise of custody rights is dangerously close to the forbidden territory of resolving the merits of the custody dispute, and

The abandonment test is "easy" for a petitioner to meet, as "very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised." *Id.* (internal citation omitted). "The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." *In re Adan*, 437 F.3d 381, 391 (3d Cir. 2006) (citing Hague Convention Analysis, 51 Fed. Reg. at 10,507). For example, a petitioner can show the exercise of custody rights by demonstrating that he or she kept, or sought to keep, some sort of regular contact with the child. *See, e.g.*, *Tsai-Yi Yang*, 499 F.3d at 277 (finding no abandonment where petitioner attempted to speak with child "whenever" possible); *Miltioadous v. Tatervak*, 686 F. Supp. 2d 544, 553 (E.D. Pa. 2010) (finding no abandonment where petitioner "was involved in the daily lives of the children," "provided the children financial and overall support for their care," and, after children were retained in U.S., continued to "pursue avenues to be reunited with his children").

Mother contends that the Third Circuit's adoption of the *Friedrich II* abandonment test is limited to Article 3, arguing that exercise under Article 13(a) is instead measured by local family law (in this case the Quintana Roo Civil Code). Hence, Mother asserts she can prevent a removal order if she proves, by a preponderance of the evidence, that Father was ***not*** exercising his custody rights in late 2018, as those rights are codified in Quintana Roo law. (*See, e.g.*, D.I. 74) The Court disagrees.

In *Baxter v. Baxter*, 423 F.3d 363 (3d Cir. 2005), the Third Circuit stated that "the test for finding the non-exercise of custody rights under the Hague Convention is stringent," and, in so

---

(3) the confusing dynamics of quarrels and informal separations make it difficult to adequately assess the acts and motivations of parents. *See* 78 F.3d at 1066. Thus, under the abandonment standard, *Friedrich II* held that a German father who telephoned and visited his two-year old son over the course of four days just prior to removal by the mother to Ohio was sufficient to establish the father was "exercising" his custody rights. *See id.* at 1066-67.

doing, relied on *Friedrich II*.  The Third Circuit in *Baxter* also relied on the Fifth Circuit's

decision in *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343-45 (5th Cir. 2004), which

had expressly adopted the abandonment test in the context of an Article 13(a) non-exercise

affirmative defense.  *Baxter* reversed and remanded a district court's denial of a father's petition

for return because, among other things, the district court had not given proper consideration of

the four Article 3 prongs in connection with the father's wrongful retention claims.  *See* 423 F.3d

at 368-70.  In the same paragraph in which the Third Circuit stated "the record demonstrates that

Mr. Baxter 'actually exercised' his custody rights under article 3 at the time of the removal and

retention," the Court, relying on *Friedrich II* and *Sealed Appellant*, determined that the record

did not support a finding that the father had ***failed to exercise*** his custody rights:

> Reduced contact or lack of financial support over [a few weeks] is insufficient under the [Hague] Convention to demonstrate that a parent has ceased exercising custody rights.  Prior to their departure, the Baxters lived together as a family and there was no allegation of non-support.  Moreover, ***as with the article 13(a) defenses of consent and acquiescence . . . the test for finding the non-exercise of custody rights under the Hague Convention is stringent***.  *See Friedrich*, 78 F.3d at 1065-66 ("The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child . . . .  If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."); *see also Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004).

*Id.* (emphasis added).

The parties dispute whether this passage in *Baxter* merely recites the abandonment test in

the context of Article 3, or whether *Baxter* instructs that abandonment is also the standard for a

non-exercise defense under Article 13.  The Court concludes that the abandonment test applies to

both Articles 3 and 13.  This conclusion is supported by the fact that, in the above passage, the Third Circuit discusses the abandonment test in the context of both Articles 3 and 13 without noting any distinction that need be made.  The Court is further persuaded by the closely parallel language between Article 13(a) – "was ***not actually exercising*** the custody rights at the time of removal or retention" – and *Baxter*'s statement that "the test for finding the ***non-***exercise of custody rights under the Hague Convention is stringent."  In addition, the Third Circuit's reliance on *Sealed Appellant* – a case which ***only*** addresses Article 13 – strongly suggests that the Third Circuit considered the phrase "exercise" as it appears in the Hague Convention to have consistent meanings across both Articles 3 and 13.

While Respondent contends that this Court would be the first "in the Third Circuit" to apply the abandonment test to Article 13(a) (*see* D.I. 74 at 4), in fact now-retired Chief Judge Jose Linares of the District of New Jersey has already done this in *Saltos v. Severino*, 2018 WL 3586274 (D.N.J. July 25, 2018).  *Saltos* expressly stated that "Respondent must meet a high standard" under Article 13(a), as "essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights."  *Id.* at *7 (relying on Third Circuit's abandonment reasoning in *Tsai-Yi Yang* and *Baxter*).  In *Saltos*, Judge Linares rejected the respondent's non-exercise defense based on the same abandonment analysis supporting his determination under Article 3; that is, that no abandonment had occurred because the petitioner had made substantial efforts to see the child (despite apparent failures to pay child support and hospital bills).  *Id.* at *8; *see also Krefter*, 623 F. Supp. 2d at 133-35 (finding no abandonment for purposes of Article 3 and adding, "[f]or the same reason, [Respondent] has not established a defense under Article 13"); *Flores v. Alvarado*, 2018 WL 3715753, at *5 (W.D.N.C. Aug. 3, 2018) (applying abandonment test to reject Article 13(a) non-

exercise defense).

This Court, then, views *Baxter* as dispositive.  As in *Saltos*, so too here: the same evidence on which Petitioner relies to show he exercised his custodial rights under Article 3, by passing the abandonment test, also means that Respondent has failed to meet her burden under Article 13 – to prove that Petitioner failed to exercise his custodial rights – as the same abandonment test applies to Respondent's affirmative defense.

Even if the Third Circuit had been silent on the Article 13 standard, this Court would reach the same conclusion by following the well-reasoned analysis of *Friedrich II*, which is the leading case on the meaning of "exercise" in the Hague Convention.  *See also generally Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) (abandonment is "the nearly-universal approach taken by courts faced with the question of the exercise of custody rights").

In any event, if it were necessary to reach the issue, the Court would also find that Father had not clearly and unequivocally abandoned Child in late 2018.  The evidence shows that Father physically cared for Child and maintained, and sought to maintain, contact with Child upon her visit to Guatemala and subsequent removal to the United States.  (*See* Hrg. Tr. at 33-34, 77-88) Even under Respondent's proposed dual-standard approach – whereby the Article 13 analysis would be governed, here, by the law of Quintana Roo – Respondent has failed to prove by a preponderance of the evidence that Petitioner was not exercising his custody rights.  Mother identifies four parental obligations under the law of Quintana Roo relevant to a two-year-old child: (1) provide aliment, (2) offer a social and family environment, (3) foster eating, hygiene, and development habits, and (4) demonstrate affection, respect, and acceptance of the child. (D.I. 82 at 3 (citing D.I. 2 Ex. B); *see also* PTX2)  To the extent a parent does not meet these obligations for three months, then an order resulting in loss of parental rights from a Mexican

family court may follow.  (D.I. 2 Ex. B at Art. 1018)  Respondent has not carried her burden with respect to the three-month window (*see* Arg. Tr. at 16-18), and her own testimony reveals that Petitioner (1) provided aliment in the form of meals (Hrg. Tr. at 79-80, 87), (2) offered a social and family environment by attending the park with Child (*id.* at 77), (3) fostered eating, hygiene, and development habits by taking Child to visit a doctor (*id.* at 87-88), and (4) demonstrated affection by spending Sunday dinners with Child (*id.* at 78).[10]

In sum, the abandonment test applies to Respondent's Article 13 affirmative defense. Thus, given Respondent's concession with respect to the fourth prong of Article 3, the Court concludes that Respondent has failed to satisfy her burden to prove her defense.[11]

## CONCLUSION

For the foregoing reasons, the Court holds that Petitioner has satisfied his burden of proving by a preponderance of the evidence that Respondent wrongfully removed Child to Delaware in violation of the Hague Convention.  Because Respondent has failed to establish any affirmative defense, the Court will grant the petition and order that Child be returned to Mexico. The Court will solicit the parties' views on how to accomplish implementation of this decision. *See generally Monasky*, 140 S.Ct. at 724 ("[T]he Convention instructs contracting states to 'use the most expeditious procedures available' to return the child to her habitual residence.").

An appropriate Order follows.

---

[10] Also noteworthy is that it is uncontested that the family – Father, Mother, and Child – were all living together in the small Room right up until the time that Mother and Child left for Guatemala.  Respondent's counsel conceded that he is aware of no case in which a parent was found to have not exercised custodial rights when he or she was living continuously with a child who is a toddler.  (*See* Arg. Tr. at 15-16)

[11] As the Court finds in favor of Petitioner on his wrongful removal claim, it need not address Petitioner's wrongful retention claim.